## Commonwealth vs. Daniel Fitzgerald.

Middlesex. February 3, 1992. - April 24, 1992.

Present: Nolan, Lynch, O'Connor, & Greaney, JJ.

*Rape. Evidence*, Scientific test, Identity, Relevancy and materiality. *Rape-Shield Statute.*

At the trial of an indictment for rape, the defendant was entitled to show that an expert witness, whose testimony was introduced by the defendant, had been selected, retained, and paid by the Commonwealth, in order to show the background of the evidence and to support its trustworthiness. [522-523]

At a rape trial the judge erred in invoking the rape-shield statute to forbid defense counsel from asking the complainant whether she had had sexual relations with someone else on the night of the incident, where the inquiry did not suggest the complainant was promiscuous as part of an attack on her credibility, but rather supported the defendant's theory of the case, which had a basis in the forensic evidence, that someone else had attacked the complainant and that she had wrongly accused the defendant. [523-525]

At the retrial of a rape indictment, the defendant would, in the circumstances, be entitled to introduce certain statements the complainant made to a rape counselor relevant to her motives to fabricate [525] and to examine certain mental health records of the complainant [525]; and the extent and content of certain jury instructions was to be determined by the trial judge [525].

INDICTMENT found and returned in the Superior Court Department on July 17, 1985.

After review by this court reported in 402 Mass. 517 (1988), the case was retried before *James D. McDaniel, Jr.*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Andrew Good* for the defendant.

*David R. Marks*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. In *Commonwealth* v. *Fitzgerald*, 402 Mass. 517 (1988), we ordered a new trial for the defendant on his conviction of rape because he should have been allowed to inform the jury that he had been sterilized by a vasectomy procedure performed twelve years prior to the alleged rape. We concluded that this evidence would have tended to show that the defendant was not the source of seminal fluid found by the Commonwealth's chemist on the complainant's underpants. After retrial, the defendant was again convicted of rape. The defendant appealed, and we granted his application for direct appellate review. We conclude that there was error at the retrial which requires reversal.

The following evidence was presented by the Commonwealth. On Tuesday night, June 4, 1985, the complainant, a sixteen year old high school student, spent the night at the defendant's house drinking alcohol. Her boy friend was with her. In the early morning hours of Wednesday, June 5, while still at the defendant's house, she had sexual intercourse with her boy friend who, the complainant testified, ejaculated inside her vagina. On June 5, she went directly to school from the defendant's house. During the school day, the complainant's school advisor drove her home, where the complainant showered, changed her underwear and shirt, and may have changed her blue jeans. The advisor then drove the complainant back to school.

Later on June 5, the complainant and her boy friend gathered at the defendant's house along with the defendant's teenaged sons and several other young men and women. The complainant drank at least four drinks of vodka and orange juice that she had taken from her parents' home without their knowledge, and at least one other alcoholic drink given to her by someone else at the defendant's house. At some time during the evening, the complainant's boy friend helped her to the upstairs bathroom. He then attempted to put the complainant in an upstairs bedroom, but the defendant told him to put her to bed downstairs in the defendant's bedroom.

She admitted she was intoxicated and unsteady on her feet when she fell asleep fully clothed on the defendant's bed. (The complainant suffers from Friedrich's ataxia, a progressive neuromuscular disorder which, unbeknownst to the complainant at the time of the attack, made her unusually susceptible to the effects of alcohol.) At some point, the complainant awoke to find herself undressed from the waist down with the defendant on top of her having intercourse. She may have been slightly intoxicated when she awoke.

To this testimony provided by the complainant, the Commonwealth added the testimony of a nurse-rape counsellor and two police officers, each of whom acted primarily as a fresh complaint witness. The police officers also testified as to the contents of a statement the defendant made while in custody, and to the circumstances and results of the execution of a search of the defendant's house pursuant to a warrant.

The defense called five witnesses. The first witness, a physician, testified that he had performed a vasectomy procedure on the defendant on October 12, 1973, and as a result of that procedure the defendant could not have emitted any sperm. The defense next called a senior chemist for the Department of Public Safety (department) who, based on tests he had performed, determined that the defendant was a type O secretor, and the complainant's boy friend a type O nonsecretor.[1] This witness also indicated that, based on tests conducted shortly after the incident, the stains found in the crotch area of the complainant's underpants contained semen and genetic markers deposited by a person with type O blood and positive secretor status.[2] The defense then called a

_____

[1] A secretor is a person whose ABO blood type can be ascertained from certain bodily fluids, such as semen, saliva, or vaginal fluid, because the person secretes certain genetic markers into these fluids. A person with positive secretor status of type A blood secretes A-antigens, one with type B blood secretes B-antigens, and one with type O blood secretes H-antigens. A nonsecretor does not secrete these markers, and his or her ABO blood type cannot be ascertained from these bodily fluids. See *Commonwealth* v. *Sims*, 30 Mass. App. Ct. 25 (1991).

[2] We note here, because it will be relevant to our later discussion, that this chemist testified as a witness for the Commonwealth at the first trial. *Commonwealth* v. *Fitzgerald*, 402 Mass. 517, 518 (1988). The department

second State chemist, who testified that she sent certain specimens to a forensic laboratory located in Denver, Colorado.[3]

Following these witnesses, the defense presented the videotaped testimony of a senior forensic geneticist from the Analytical Genetic Testing Center (AGTC) in Denver, Colorado. The AGTC laboratory performed several tests in 1989 (after we had ordered a new trial) on the materials taken from the complainant and other samples and found that: (1) the complainant was a type O secretor; (2) the defendant's semen contained no sperm cells; (3) the complainant's boy friend was a type O nonsecretor, and (4) the crotch area of the complainant's underpants revealed the presence of bodily fluids from someone who secreted type B-antigens and, therefore, was a member of blood group B. Neither the complainant, her boy friend, nor the defendant has type B blood.

The last defense witness was the complainant's boy friend who admitted having intercourse with the victim in the early morning hours of June 5, and stated that he had ejaculated "near her or in her."

We now summarize the rulings which we shall conclude were erroneous. Prior to trial, the Commonwealth filed a motion entitled "Motion in Limine As to Circumstances By Which Serological Testing Was Performed." This motion sought to exclude at trial all mention by the defense that the Commonwealth had selected, retained, and compensated AGTC in 1989 to perform additional tests and that the prosecutor had been the recipient of the report of the AGTC's test results. Over objection by defense counsel, the judge al-

---

never received a blood sample from the complainant and therefore never tested the complainant's blood or bodily fluids to ascertain her ABO blood type or secretor status. It appears that the State chemists acted on the theory that the genetic markers in the stain were deposited with the semen. The department was not able to test whether the markers could have been deposited by the complainant's own bodily fluids.

[3]The defense called both State chemists in order to establish the chain of custody of materials sent to the private laboratory. The Commonwealth is "not compelled to stipulate" to the chain of custody. *Commonwealth* v. *Roberts*, 407 Mass. 731, 735 (1990), quoting *Commonwealth* v. *Nassar*, 351 Mass. 37, 46 (1966).

lowed the Commonwealth's motion, and ruled that this information was collateral and irrelevant. As a result, defense counsel could not bring to the jury's attention the fact that the B-antigen finding was made by a laboratory which had been selected, retained, and paid by the Commonwealth, and this information was edited out of the videotaped testimony of the geneticist from AGTC that was shown to the jury.

Prior to trial, the defendant filed a motion pursuant to the rape shield statute, G. L. c. 233, § 21B (1990 ed.),[4] entitled "Motion in Limine Concerning Sexual Activity of Complainant." Ruling on this motion was deferred by the judge until the cross-examination of the complainant at trial. During cross-examination of the complainant, based on the scientific evidence of the finding of B-antigens, defense counsel sought to ask the complainant whether she had intercourse with anyone other than her attacker on the night of the alleged rape. The judge excluded the question. The judge expressed the view that the inquiry was speculative, irrelevant, and improper unless the defendant could prove the identity of the unvasectomized male who might have secreted the B-antigens in the course of sexual intercourse with the complainant. The judge also felt that, because enough had not been shown to permit the question to prove possible bias on the complainant's part, allowing the question would violate the

---

[4]General Laws c. 233, § 21B (1990 ed.), sets forth: "Evidence of the reputation of a victim's sexual conduct shall not be admissible in any investigation or proceeding before a grand jury or any court of the commonwealth for a violation of [G. L. c. 265, §§ 13B, 13F, 13H, 22, 22A, 23, 24, 24B and G. L. c. 272, § 5]. Evidence of specific instances of a victim's sexual conduct in such an investigation or proceeding shall not be admissible except evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however, that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof. If, after said hearing, the court finds that the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim, the evidence shall be admitted; otherwise not. If the proceeding is a trial with jury, said hearing shall be held in the absence of the jury. The finding of the court shall be in writing and filed but shall not be made available to the jury."

rape-shield statute by interjecting prejudicial material into the trial.

The issue of the defendant's right to this testimony reemerged as a result of the Commonwealth's cross-examination of one of the State chemists called by the defense. In response to questioning by the prosecutor, the chemist indicated that nonmotile sperm can exist in the vaginal canal for up to five days. At the conclusion of the defense case, in response to the testimony elicited on cross-examination, the defendant's counsel moved to recall the complainant to ask her whether she had sexual relations with anyone other than her boy friend and her attacker during the five-day period prior to the incident. The purpose of the proposed inquiry was to rebut the evidence elicited by the prosecutor that nonmotile sperm and, inferentially, the B-antigens, could have been present in the complainant's vaginal canal for up to five days prior to the alleged rape. Concluding that the proposed inquiry was still speculative and improper, the judge denied the motion to recall the complainant.

1. The rulings described above were erroneous. The defendant conceded at trial that the complainant had been raped. He maintained that he, however, had not committed the crime. He argued that the perpetrator was probably the secretor of the B-antigens and that the complainant had wrongly identified him either accidently (because she was too intoxicated to tell who her attacker was) or purposely. The defendant also suggested that the complainant (because of her intoxicated condition) could not identify the secretor of the B-antigens as her attacker and, consequently, fabricated her accusation of him to avoid her parents' disapproval and anger over her conduct.

The defense had a basis in the evidence to propose these contentions. There was scientific evidence indicating that, because of his vasectomy, the defendant could produce no sperm; therefore, he could not have secreted the sperm cells found in the complainant's vaginal canal and in the crotch area of her underpants. The type O genetic markers found in the crotch area of the complainant's underpants could have

come from her own bodily secretions and not necessarily from the defendant. Importantly, the secretor of the B-antigens could not have been the defendant, the complainant, or her boy friend. There was also evidence that the complainant was intoxicated and evidence the complainant's parents would likely be angry because of her activities.

It is also reasonably apparent that the prosecution changed its strategy after the first trial because of the defendant's proof that he had undergone a vasectomy procedure and the finding of B-antigens. Instead of calling a State chemist as a prosecution witness (as had been done in the first trial, see note 2, *supra*), the prosecutor left both chemists to be called by the defense. The prosecutor was also careful to obtain from one of the State chemists in cross-examination a fact which could be argued in explanation of the B-antigens (that nonmotile sperm can remain in the vaginal canal for up to five days), and later to argue to the jury that this chemist's testimony was more credible than the information furnished by AGTC because the testing done by the department was done much closer in time to the date of the incident. The prosecution also did not want to call the geneticist from AGTC, probably because that laboratory had made findings that, along with the proof of the defendant's vasectomy, introduced evidence into the case that cast doubt on the reliability of the complainant's testimony.

In the context described above, the judge should not have prohibited defense counsel from bringing to the jury's attention that AGTC had been selected, retained, and paid by the Commonwealth and from inquiring of the complainant whether she had intercourse with anyone else on the night of the incident.

As to the first point, the jury were entitled to know that AGTC had been selected, retained, and paid by the Commonwealth. The information was relevant to show the background of the evidence and to support its trustworthiness. See *New England Tel. & Tel. Co.* v. *Assessors of Boston*, 392 Mass. 865, 870 (1984). See also *Commonwealth* v. *Britland*, 300 Mass. 492, 496 (1938). It does not matter

which side to the case called the witness, and we reject the Commonwealth's argument that the facts could not be brought out until the prosecutor had impeached the credibility of the AGTC geneticist.[5]

On the second point, the judge erred in invoking the rape-shield statute to forbid defense counsel from asking the complainant whether she had sexual relations with someone else on the night of the incident. "Rape-shield statutes are 'aimed at eliminating a common defense strategy of trying the complaining witness rather than the defendant. The result of this strategy was harassment and further humiliation of the victim as well as discouraging victims of rape from reporting the crimes to law enforcement authorities.' " *Commonwealth v. Joyce*, 382 Mass. 222, 228 (1981), quoting *State v. Williams*, 224 Kan. 468, 470 (1978). The rape-shield statute is principally designed to prevent defense counsel from eliciting evidence of the victim's promiscuity as part of a general credibility attack.

Contrary to the Commonwealth's assertions, the defendant was not seeking to use the evidence for any of the purposes that the rape-shield statute forbids. It was expected that the question would have produced a negative answer. The intended examination would not have suggested that the com-

---

[5]In point of fact, the prosecutor did impeach the findings of the AGTC geneticist in several ways. First, on cross-examination of one of the State chemists, the prosecutor elicited testimony that the department had found only H-antigens, consistent with the defendant's blood type, see note 1, *supra*, in the semen stain on the complainant's underpants. Second, the prosecutor asked about the time frame during which the department's testing was done, thereby drawing out testimony that it had tested the materials in question within one month of the alleged rape. Finally, on cross-examination of the AGTC geneticist, the prosecutor asked whether testing done close in time to the alleged rape was "the most preferable." All of these questions were designed to lead the jury to conclude that the department's findings were more reliable than findings made by AGTC. The defendant was entitled to show that the Commonwealth had hired AGTC to perform the very tests that the prosecutor suggested were conducted too remotely from the time of the rape to be reliable. By strategic use of cross-examination of the State chemists and the AGTC geneticist, the prosecutor suggested that the testing by AGTC was a late contrivance of the defense.

plainant was promiscuous,[6] and did not amount to a general attack on her credibility. Rather, the evidence tended to support the defendant's theory of the case: that someone else had attacked the complainant and she had wrongly accused the defendant. The inquiry was relevant and outside of the prohibition of the rape-shield statute. See *Commonwealth* v. *Chretien*, 383 Mass. 123, 135 (1981). See generally P.J. Liacos, Massachusetts Evidence 408 (5th ed. 1981). The judge understood the defendant's theory of admissibility, but incorrectly ruled that the defendant had failed to lay a proper foundation for the question. In essence, the judge ruled that the defendant would have to establish the *identity* of the person with the B-antigens by putting forward evidence that one of the males at the defendant's house on the night of the rape could have been the source of the B-antigens before the question would be permitted. This requirement went too far.[7]

These errors were prejudicial. Without the excluded evidence, the jury deliberated for over two days before reaching a verdict. Both of the errors prevented the jury from evaluating evidence that went to the heart of the defendant's theory of innocence. "The essential question is whether the error had, or might have had, an effect on the jury and whether

---

[6]In fact, the prosecutor offered the complainant's testimony concerning her sexual activity with her boy friend on the night before the rape, and her use of birth control pills, as part of the Commonwealth's case. The prosecutor probably offered this evidence in order to account for the presence of sperm in the complainant's vaginal canal; the evidence showed that the defendant, having had a vasectomy procedure, could not have produced the sperm.

[7]It follows that the judge also erred in denying the defense motion to recall the complainant after the Commonwealth elicited evidence that the semen stain found in the crotch area of the complainant's underpants might have been the product of a "number of donors." On cross-examination of the State chemists, and the AGTC geneticist, the Commonwealth elicited testimony that none of tests performed by either laboratory could determine the number of donors to a particular stain, thereby suggesting that both the defendant and the unknown secretor of the B-antigens might have had intercourse with the victim during the period in question. Defense counsel should have been permitted to rebut this inference by reexamining the complainant on this issue.

the error contributed to or might have contributed to the verdict[ ]." *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990). The rulings in this case meet this test.

2. We comment briefly on the issues likely to arise at any retrial.

(a) In view of the prosecution's admission in evidence of the complainant's statements to a rape counselor, and the complainant's waiver of her right to confidentiality as to her conversations with the counselor, the defendant can introduce from the counselor's notes the complainant's statements that she had been in conflict with her mother for some time and had been receiving therapy with her mother because of physical health problems.[8] This information is relevant on the issue of the complainant's motives to fabricate a rape accusation in order to avoid parental disapproval of her misconduct.

(b) Examination of the complainant's mental health records is to proceed in accordance with the instructions in *Commonwealth* v. *Stockhammer*, 409 Mass. 867, 883-884 (1991).

(c) The decision whether to instruct the jury on inferences that may be drawn from the failure of the police and prosecution to conduct adequate forensic tests is a matter entrusted to the discretion of the trial judge. *Commonwealth* v. *Cordle*, *ante* 172, 177 (1992), and cases cited. See *Commonwealth* v. *Andrews*, 403 Mass. 441, 463 (1988).

(d) Similarly, the content and extent of instructions on the issues of identification and the effect of alcohol present matters for the trial judge to decide after discussion with counsel based on the theories and evidence at any retrial.

Accordingly, the judgment is reversed, the verdict set aside, and the case is remanded for a new trial.

*So ordered.*

---

[8]The complainant suffers from Friedrich's ataxia, a progressive neuromuscular disorder.