## COMMONWEALTH *vs.* JORDAN MARTEL RICE.

Plymouth. January 9, 2004. - March 24, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Burning of a Dwelling House. Attorney at Law,* Withdrawal. *Search and Seizure,* Expectation of privacy. *Evidence,* Expert opinion. *Witness,* Expert. *Practice, Criminal,* Argument by prosecutor, Assistance of counsel.

A criminal defendant's motion to suppress evidence, including his bed sheets, his inmate uniform, and his T-shirt, which corrections officers had seized in the normal course of collecting laundry when the defendant was in custody on charges unrelated to those at issue, was properly denied, where the defendant did not have a reasonable expectation of privacy in the items seized. [294-296]

The judge hearing the motion of a criminal defendant's counsel to withdraw did not abuse his discretion in denying the motion, where the judge considered all the relevant factors, including the nature and seriousness of the problem between the defendant and counsel, the needs of judicial administration, and the defendant's wish not to proceed without counsel and his statement that he had not arranged to engage successor counsel. [296-297]

At the trial of indictments for murder in the first degree and arson, the judge did not abuse his discretion in admitting in evidence expert testimony from a forensic chemist regarding the length of time that sperm cells retain their tails after ejaculation (relevant because sperm cells with tails were found in the victim), where the witness had the education, training, and experience to give the opinion in question. [297-299]

No substantial likelihood of a miscarriage of justice arose from statements a prosecutor made at the trial of indictments for murder in the first degree and arson, where the prosecutor's arguments were grounded in evidence and the inferences he suggested were reasonable. [299-302]

A Superior Court judge presiding over the trial of indictments charging murder in the first degree and arson did not err in declining to instruct the jury that they must be unanimous regarding any factor relied upon to reach a verdict of murder in the first degree based on extreme atrocity or cruelty. [302]

A Superior Court judge properly denied a criminal defendant's motion for a new trial alleging ineffective assistance of counsel, where none of the instances of perceived inadequacy to which the defendant pointed showed a decision regarding the evidence that was manifestly unreasonable [302-310]; moreover, the judge properly denied the defendant's request for posttrial discovery and an evidentiary hearing on the motion for a new trial. [310]

INDICTMENTS found and returned in the Superior Court Department on October 15, 1996 and December 9, 1996.

The cases were tried before *Charles J. Hely*, J., and a motion for postconviction relief, filed on November 4, 2002, was considered by him.

*Mary E. Lee*, Assistant District Attorney, for the Commonwealth.

*Donald A. Harwood* for the defendant.

SPINA, J. The defendant was convicted of murder in the first degree on a theory of extreme atrocity or cruelty. He was also convicted of arson. He filed a motion for a new trial alleging ineffective assistance of counsel. The motion was denied without a hearing. On appeal the defendant alleges error in (1) the denial of his motion to suppress evidence; (2) the denial of trial counsel's motion to withdraw; (3) the admission of certain expert testimony; (4) the prosecutor's summation; (5) the judge's instruction on extreme atrocity or cruelty; and (6) the denial of his motion for a new trial. The defendant also asks us to exercise our power under G. L. c. 278, § 33E, to reverse the murder conviction and dismiss the indictment, or remand for a new trial. We affirm the convictions and decline to exercise our power under § 33E.

1. *Background.* On September 22, 1995, the victim attended a wedding reception with friends. She arrived at approximately 7:30 P.M. and left at approximately 10:30 P.M. The defendant also attended the reception, staying until about 1 or 1:30 A.M. on September 23.

The victim telephoned her daughter at 1 A.M. on September 23, and there was nothing unusual about her tone of voice. She left a voicemail message for her boy friend at 1:15 A.M., which was also unremarkable. At 4:40 A.M. on September 23, neighbors in the victim's Brockton apartment complex awoke to the smell of smoke and telephoned the Brockton fire department. Fire fighters arrived within minutes and went to the victim's apartment, which was the apparent source of the fire. The front door was ajar. They entered and went to the bedroom. The victim's naked and lifeless body lay on the bed, which was in flames. A smoke detector had been dismantled and placed under the bed. An arson investigator determined that attempts had been made

to burn a blood-soaked couch in the living room, but were unsuccessful because the couch was made of flame retardant material. The bed had been set afire by igniting a cardboard box and papers that had been placed under the foot of the bed.

A forensic pathologist determined that the victim had eleven stab wounds and four incised wounds to her body consistent with a single edged knife blade at least two inches long. A wound to her right upper chest corresponded with a punctured blood vessel that supplied blood to the right lung, causing her to bleed to death within minutes. The pathologist estimated the time of death at between approximately midnight and 4 A.M. on September 23, 1995, and that the absence of carbon monoxide in her blood and soot in her lungs suggested that she was dead when the fire started. The presence of full sperm cells in her vagina indicated that she had had sexual intercourse within eighteen to twenty-four hours of the autopsy, which had begun at 1 P.M. on September 23. Deoxyribonucleic acid (DNA) testing established that the defendant was the source of the sperm. There was no other physical evidence connecting the defendant to the victim's apartment.

When the defendant was interviewed by police on January 5, 1996, he admitted knowing the victim and where she lived (they lived in the same apartment complex), but denied ever having sexual intercourse with her. He acknowledged that he was at the wedding reception on September 22, 1995, but said he was alone and left at about 1 A.M. He then went directly home where he stayed for the night.

Several friends and acquaintances of the defendant testified about statements he made. Alan Paine testified that in September, 1995, shortly after the victim was killed, he telephoned the defendant and asked if he was aware of her death. The defendant replied in the negative. When Paine asked if he killed her, the defendant replied that he "can't talk about that," and later told Paine he thought his telephone was tapped. In January or February, 1996, the defendant told Paine, in the presence of Paine's girl friend, that the police took his fingerprints. He then asked Paine how long it would take the police to obtain the results of a fingerprint analysis, and if burning something would destroy prints. In February, 1996, the defendant told Paine and Jamie

Baker that he had had a girl friend who "disrespected him, and he had gotten rid of her, and had put plenty of holes in her, and burned her." In March, 1996, the defendant told Paine that he "expected to be arrested for murder" and that the police were "trying to set [him] up like O.J. Simpson."

On January 28, 1996, at a birthday party for Joanne Maldonado's daughter, the defendant was being teased by some children about "beating up his girl friend." Maldonado asked him about it and the defendant said "the bitch got what she deserved. I smoked her ass." The defendant then stormed out of the house. Teresa Baker, Maldonado's daughter, overheard the conversation.

The defendant testified at trial that he had had consensual intercourse with the victim at approximately 4 P.M. on September 22, 1995, and had begun an intimate relationship with her about one month before. He said he lied to the police about not having sexual relations with her because he was afraid. He denied making incriminating statements to Alan Paine and the others, and he denied killing the victim.

2. *Motion to suppress.* The defendant filed a motion to suppress certain items, including his bed sheets, his inmate uniform, and his T-shirt, that were seized in August, 1996, by correction officers at the Suffolk County house of correction at South Bay, where the defendant was in custody on an unrelated charge. It is not disputed that the items were seized without a search warrant, without probable cause, and without the defendant's consent. The items were seized at the request of State police for DNA testing. The defendant also sought suppression of the fruits of the items seized, including DNA test results. After a hearing, a judge in the Superior Court denied the motion on the ground that the defendant did not have a reasonable expectation of privacy in the items seized.

The judge found, with record support, that the items in question were obtained in the ordinary course of collecting standard issue bed sheets and inmate uniforms for periodic laundering. The T-shirt was obtained in the ordinary course of exchanging new T-shirts and underwear for worn out items. In each instance, the items were obtained after the defendant passed them through a space in his cell door created for such purposes, as is done by

all inmates at the South Bay facility. The defendant's items were segregated from those of other inmates and turned over to State police. DNA samples obtained from these items were tested and matched the DNA of the sperm found in the victim's vagina.

The defendant has the initial burden to establish that a search and seizure occurred within the meaning of the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights. That is, the defendant must show that he had a subjective expectation of privacy in the place searched or the items seized and that his expectation of privacy was objectively reasonable. See *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 714-715 (1986).

The defendant's reliance on *United States* v. *Cohen*, 796 F.2d 20, 24 (2d Cir.), cert. denied, 479 U.S. 854 (1986), and cert. denied sub nom. *Barr* v. *United States*, 479 U.S. 1055 (1987), is misplaced. In that case, the court held that a pretrial detainee retains limited rights under the Fourth Amendment against an investigative search of his prison cell initiated by the prosecution. In a subsequent case, the United States Court of Appeals for the Second Circuit held that its *Cohen* decision was limited to pretrial detainees. See *Willis* v. *Artuz*, 301 F.3d 65 (2d Cir. 2002). Here, the defendant did not establish his status as a pretrial detainee,[1] but more importantly, he did not establish that the items he sought to suppress were seized during a search of his cell. The judge found that the defendant passed the items through a space in his cell door to a correction officer standing outside the cell.

The defendant did not have a reasonable expectation of privacy in the items seized. His bed sheets and uniform belonged to the county. They were laundered with similar items used by other inmates and redistributed to inmates randomly. Any rights he might have enjoyed were abandoned when he surrendered them for laundering. Cf. *Commonwealth* v. *Pratt*, 407 Mass. 647, 660 (1990). Although he owned the T-shirt, he abandoned any interest he may have had in it when he sur-

---

[1]The defendant never alleged that he was a pretrial detainee, and in any event, the record indicates that he was serving a one-year sentence following revocation of probation on April 12, 1996, on unrelated charges.

rendered it for a replacement. *Id.* There was no error in the denial of the defendant's motion to suppress.

3. *Motion to withdraw as counsel.* On August 26, 1998, trial counsel filed a motion to withdraw, alleging in his supporting affidavit an irretrievable breakdown of the attorney-client relationship arising from the defendant's confrontational attitude and refusal to accept his advice. The hearing on the motion, though spread out over two days, was not lengthy. On the second hearing day the defendant asserted that any lack of cooperation was not on his part, but on the part of counsel, who insisted on "put[ting] up the defense he wants . . . [not] the defense that . . . I want." The judge expressed incredulity at the defendant's assertion that counsel failed to communicate with him or show him any paperwork that he had done in the case. Near the conclusion of the hearing the defendant stated, "I have no problem going forward with [counsel] if we can . . . cooperate. . . . I'm more than willing to cooperate with him."

In a written decision, the judge, who was also the trial judge, denied the motion. He found "that there has not been an irreconcilable breakdown in the attorney-client relationship," and that the defendant's "unjustifiable mistrust[]" and "lack of full cooperation has not prevented [experienced counsel] from providing a thorough and competent representation of the defendant. His pretrial preparations have been extensive and include careful preparation and expert consultation on the difficult DNA issues."

The judge described in detail the defendant's tortuous history with two previous attorneys appointed to represent him in the case. The defendant had moved to discharge his first attorney, also an experienced criminal defense attorney, for reasons that included counsel's refusal to engage a particular person as his private investigator. That motion was denied after a hearing before a different judge, who concluded that the defendant's first attorney "has been competent, loyal and diligent in his handling of [the] case thus far." A second attorney was appointed to pursue an interlocutory appeal, but while that matter was pending the defendant's family retained his third attorney (trial counsel). The judge noted that, unlike his experience with

first counsel, the defendant did not file a motion to discharge his third attorney; it was the third attorney who filed a motion to withdraw.

The judge noted that a trial date had been set in early October, just five weeks away, and that two previously scheduled trial dates had to be changed because of pending motions in the case or for reasons attributable to the court's backlog. The judge also considered the statement of the defendant that he had not made arrangements for representation by any other attorney, and was not interested in representing himself.

There is no mechanical test to be applied in deciding a motion to withdraw. Cf. *Commonwealth* v. *Chavis*, 415 Mass. 703, 711 (1993) (motion to discharge counsel). Here, the judge considered all the factors relevant to this case. He considered the nature and seriousness of the problem between the defendant and counsel, including the defendant's willingness to cooperate with experienced trial counsel and the extent and high quality of the work and preparation that had been put into the case. The judge also gave a balanced consideration to the legitimate needs of judicial administration. Finally, the judge considered the defendant's wishes not to proceed without counsel and his statement that he had made no arrangements to engage successor counsel. The defendant has failed to demonstrate that the judge abused his discretion in denying counsel's motion to withdraw. See *Commonwealth* v. *Chavis*, *supra* at 712.

To the extent that the defendant now contends that it was his request to discharge counsel, he failed to show good cause for removal, such as "a conflict of interest, incompetence of counsel, or an irreconcilable breakdown in communication." *Commonwealth* v. *Chavis*, *supra*. The judge gave him ample opportunity to articulate his reasons, see *Commonwealth* v. *Moran*, 388 Mass. 655, 659 (1983). The judge did not abuse his discretion by denying the motion to withdraw, especially where the defendant indicated that he was willing to cooperate with counsel, and where he knew how to pursue a motion to discharge counsel but did not do so in this instance.

4. *Expert testimony*. The defendant alleges error in the admission of testimony from the Commonwealth's forensic chemist that sperm with tails may be found up to sixteen hours after

ejaculation, as a subject beyond the witness's area of expertise. The defendant suggests that the testimony of the Commonwealth's pathologist, to the effect that it is generally recognized within the medical profession that sperm cells lose their tails approximately eighteen to twenty-four hours after ejaculation, demonstrates that the chemist was unqualified to give an opinion about the life expectancy of sperm. There was no objection, so we review under G. L. c. 278, § 33E, to determine if any error created a substantial likelihood of a miscarriage of justice.

" 'The crucial issue' in determining whether a witness is qualified to give an expert opinion, 'is whether the witness has sufficient "education, training, experience and familiarity" with the subject matter of the testimony." *Commonwealth* v. *Richardson*, 423 Mass. 180, 183 (1996), quoting *McLaughlin* v. *Selectmen of Amherst*, 422 Mass. 359, 362 (1996). "A judge has wide discretion in qualifying a witness to offer an expert opinion on a particular question . . . and his determination will not be upset on appeal if any reasonable basis appears for it" (citations omitted). *Commonwealth* v. *Mahoney*, 406 Mass. 843, 852 (1990). "There is no requirement that testimony on a question of discrete knowledge come from an expert qualified in that subspecialty rather than from an expert more generally qualified." *Id.*

The witness had been employed as a chemist at the State police crime laboratory for sixteen years. He had taken numerous certificate courses and seminars in topics pertinent to forensic chemistry, and he based his testimony about the length of time sperm retain their tails on a study he had read. He had the education, training, and experience to give the opinion in question. Moreover, it was closely related to a subject about which the Legislature has said that a State police chemist's opinion is admissible in evidence. See G. L. c. 22C, § 41 (certificate of State police chemist of results of analysis for presence of sperm cells prima facie evidence). See *Commonwealth* v. *Juzba*, 46 Mass. App. Ct. 319, 322 (1999). Because the witness was generally qualified to testify about the presence of sperm cells, in whatever condition they might be found, it was not an abuse of discretion to permit him to testify about changes that sperm cells undergo over time.

We note that it is not uncommon for a State police chemist to opine on the life expectancy of sperm cells. See, e.g., *Commonwealth* v. *Fitzgerald*, 412 Mass. 516, 521 (1992) (State police chemist testified that nonmotile sperm can exist in vaginal canal up to five days); *Commonwealth* v. *Dranka*, 46 Mass. App. Ct. 38, 39 (1998) (State police chemist testified that motile sperm can be detected up to forty-eight hours after intercourse, and immotile sperm from two days to two weeks after intercourse). Any difference between the testimony of the chemist and the pathologist went to the weight of the testimony, not its admissibility. See *McLaughlin* v. *Board of Selectmen of Amherst*, *supra* at 361-363.

The defendant also argues that the chemist and the pathologist did not have sufficient qualification to opine that heat can accelerate the deterioration of sperm cells. The witnesses indicated that their testimony was based on their education, training, and experience. Other than his conclusory assertion that the judge erred, the defendant has not shown, as it is his burden to show, why the judge abused his discretion in admitting this testimony.

5. *Prosecutor's summation.* The defendant cites seven instances where he alleges the prosecutor improperly argued from personal belief and not from the evidence. There was no objection, so we review each instance to determine whether any misconduct caused a substantial likelihood of a miscarriage of justice.

The prosecutor properly asked the jury to infer that the victim knew her assailant and had let him into her home because there were no signs of forced entry. The prosecutor had invited the jury to look at photographs of the apartment, exhibits in the case, which showed no signs of forced entry. The evidence also indicated that the neighbors in the apartment complex were awakened not by noise, but smoke. Evidence that the bedroom had been "ransacked" does not, as the defendant contends, refute the evidence on which the prosecutor based his argument. The argument was grounded in evidence, and the inference he suggested was reasonable. See *Commonwealth* v. *Chavis*, *supra* at 713.

The prosecutor suggested that the killer used a bloody pajama

top found just inside the slightly opened front door to avoid leaving fingerprints on the doorknob and then left the door slightly ajar so he could throw the pajama top inside the apartment. There is no requirement that the evidence lead inescapably to the scenario imagined by the prosecutor. An inference is proper if it is fairly inferable from the evidence, that is, if it is reasonable and possible, as here. See *Commonwealth* v. *Pope*, 406 Mass. 581, 587 (1990).

The defendant faults the prosecutor for misstating the pathologist's testimony concerning the victim's rapidly fatal wound as one that "sever[ed] important arteries." The pathologist did not use the term "artery," as the defendant correctly points out. The pathologist described the wound as one that "cut into a major blood vessel that supplies the right lung with blood," and which caused the victim to bleed to death within minutes. Trial attorneys cannot be held to absolute precision in recalling the testimony at trial, or even the precision enjoyed by appellate counsel who have the benefit of a transcript. We would not characterize the prosecutor's summary of the pathologist's testimony as a misstatement. The prosecutor's summary was fair and faithful to the point on which the pathologist had testified.

Similarly, the prosecutor did not misstate the testimony of Trooper Scott Berna when he argued that Berna had never seen the defendant as nervous as he was on the day of his interview. Berna testified that he had met the defendant once or twice before and when he interviewed him, the defendant was "very nervous" and was sweating throughout the entire interview, frequently avoiding eye contact with the officers when answering their questions. The difference between the degree of nervousness demonstrated by the defendant according to Berna, and as that testimony was summarized by the prosecutor, is qualitatively insignificant.

The prosecutor did not, as the defendant next argues, improperly comment on the defendant's criminal history by arguing that the police knew him. There was testimony from Trooper Joseph Mason, who arrived at the victim's apartment on the morning of September 23 and noticed the defendant in a crowd of onlookers outside the apartment. He recognized the

defendant as someone he had known for four years. The prosecutor did not argue that the defendant should be convicted because of his criminal history. He challenged the believability of the defendant's assertion that he lied to Mason about never having had sexual relations with the victim because he was afraid, where the two men had known one another and the defendant had no reason to be afraid of Mason, and was instead trying to conceal his guilt. In any event, the defendant offered evidence of his own criminal record during his direct testimony, see *Commonwealth* v. *Coviello*, 378 Mass. 530, 533 (1979), so the jury heard about his prior criminal history from the defendant himself. There was no misconduct.

There is no merit to the claim that the prosecutor engaged in inflammatory argument when he said that the defendant had lied to police about not having had sexual intercourse with the victim. The defendant did lie, and he admitted it in his testimony. When the evidence proves that the defendant has lied, it is not improper to refer to him as a liar. See *Commonwealth* v. *Oliveira*, 431 Mass. 609, 613 (2000), *S.C.*, 438 Mass. 326 (2002).

Finally, the defendant argues that the prosecutor unfairly argued to the jury that he held a knife to the victim's neck while he raped her. He contends that there was no evidence to support the Commonwealth's theory that the victim had been raped.[2] His claim that there was no evidence of aggravated rape is based on the absence of seminal fluid in the crotch area of the victim's pajamas, and the absence of trauma to her genitalia. However, the Commonwealth's theory of aggravated rape was that the defendant compelled the victim to submit to sexual intercourse by threat of bodily injury at knife point. There was evidence from which the jury could have found that the defendant had intercourse with the victim sometime between 1:15 A.M. and 4 A.M. on September 23, 1995; that he held a knife to her neck, evidenced by the knife wounds on her neck and the statements he made to friends; that he raped and killed her; and that he then tried to incinerate her body. Under the

---

[2]Although the Commonwealth proceeded against the defendant on a theory of felony-murder with aggravated rape as the predicate felony as well, he was not convicted on that basis.

Commonwealth's theory of aggravated rape, there would be no reason to find semen on her pajamas (she had been found naked), and there would be no reason to expect trauma to her genitals. The inference that she was raped at knife point was based on the evidence, and the inference sought by the prosecutor was reasonable.

6. *Jury instructions.* The defendant argues that the judge erred by failing to instruct the jury that they must be unanimous with respect to any *Cunneen* factor relied on to reach a verdict of murder in the first degree under the theory of extreme atrocity or cruelty. We have recently rejected this same and similar arguments. See *Commonwealth* v. *Moses*, 436 Mass. 598, 605-607 (2002), citing *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983); *Commonwealth* v. *Obershaw*, 435 Mass. 794, 809 (2002); *Commonwealth* v. *Hunter*, 427 Mass. 651, 657 (1998).

7. *Motion for a new trial.* The defendant filed a motion for a new trial alleging ineffective assistance of counsel based on eleven instances of perceived inadequacy. He claims error in the denial of his motion, and in the denial of his requests for post-conviction discovery and an evidentiary hearing.

When reviewing claims of ineffective assistance of counsel under G. L. c. 278, § 33E, we first determine "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge), and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Claims of ineffectiveness based on tactical decisions are scrutinized under the "manifestly unreasonable" standard. *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

When reviewing the denial of a motion for a new trial, which is addressed to the sound discretion of the judge, *Commonwealth* v. *Smith*, 381 Mass. 141, 142 (1980), we will not disturb the judge's disposition unless it is manifestly unjust, *Commonwealth* v. *Little*, 384 Mass. 262, 269 (1981), rev'd on other grounds, *Commonwealth* v. *Santos*, 402 Mass. 775, 788 (1988), or unless the trial was infected with prejudicial constitutional error. *Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). "Reversal for abuse of discretion is particularly rare where the judge acting on the motion [for a new trial] was also the trial judge."

*Commonwealth* v. *Schand,* 420 Mass. 783, 787 (1995). Here, the judge who decided the motion for a new trial was also the trial judge.

(a) The defendant points to over sixty items that he says defense counsel should have had analyzed to determine if any item had evidentiary value. Without going through each item, it is enough to say that the defendant has presented no affidavit from any expert indicating what testing might have been done, the expected results, and the significance of such results. He has made no showing that any tests would have produced something that likely would have influenced the outcome of the case. See *Commonwealth* v. *Britto,* 433 Mass. 596, 607 (2001).

(b) The defendant raises several issues about a coffee cup with a blood stain and partial palm print found in the victim's kitchen sink. The palm print was preserved photographically, but the print itself was accidentally destroyed on September 27, 1995, during an attempt to enhance it. The Commonwealth obtained palm print exemplars from forty-eight persons, including the defendant and the victim, for comparison with the photograph of the palm print on the coffee cup. State police fingerprint experts could not identify sufficient points of comparison (eight points are required by State police) to identify or exclude anyone as the source of the print. The defendant was indicted for the murder in October, 1996, over one year after the print was accidentally destroyed.

Contrary to the defendant's assertion, counsel could have done nothing to preserve the palm print. The print was destroyed before the defendant was indicted. In addition, the defendant has failed to show that further comparison of the photograph of the palm print with the known exemplars would have produced anything that would have helped the defense. See *Commonwealth* v. *Britto, supra.*

The defendant contends that counsel at least should have confirmed through an expert that neither he nor the victim left the bloody palm print on the coffee cup. He misrepresents the evidence. The State police fingerprint experts excluded no one as the author of the palm print. There were insufficient points of comparison to either identify or exclude any of the forty-eight persons from whom exemplars were obtained. Moreover,

because there is no affidavit from trial counsel, the defendant's assertions about what counsel did not do is speculative and need not be considered. See *Commonwealth* v. *Knight*, 437 Mass. 487, 502 & n.17 (2002).

The defendant also claims that counsel failed to ascertain the truth about the destruction of the bloody palm print. In support of this claim he offers the affidavit of his investigator, who claims to have spoken with the agent from the Federal Bureau of Investigation who allegedly destroyed the print and received an account that differs from that given by the Commonwealth. The agent himself did not submit an affidavit; thus, the investigator's affidavit constitutes hearsay that need not be considered. *Commonwealth* v. *Francis*, 432 Mass. 353, 372 (2000).

(c) The defendant's assertion that counsel failed to present evidence establishing that no rape occurred is without merit. He bases his claim on the absence of semen on the crotch area of the victim's pajamas and the absence of trauma to her genitalia. Such evidence does not establish that no rape occurred, as discussed in Part 5, *supra*. Moreover, the defendant was not convicted of felony-murder by reason of aggravated rape, and therefore nothing more could have been done for the defense with respect to this issue.

(d) The defendant faults counsel for failing to file a motion to dismiss the indictments on grounds that potentially exculpatory evidence, the bloody palm print on the coffee cup, was destroyed. When potentially exculpatory evidence is lost, the trial judge has discretion to fashion a remedy after "weigh[ing] the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant" in order to ensure the defendant's constitutional right to a fair trial. See *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). Here, although the original print was lost, the image of the print was effectively preserved by photograph. The defendant has not shown that the photograph was a less effective standard for comparison to known exemplars than the original print. See *Commonwealth* v. *Cintron*, 438 Mass. 779, 784-785 (2003). The judge correctly analyzed the issue and concluded that dismissal would not have been warranted because the lost evidence did

not "create[] a reasonable doubt as to the defendant's guilt that would not otherwise exist," *Commonwealth* v. *Kater*, 432 Mass. 404, 418 (2000); *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991), and therefore the defendant had not made the requisite showing of incompetence of counsel or that he was deprived of a material ground of defense. See *Commonwealth* v. *Hunter*, 426 Mass. 715, 718-719 (1998) (destruction of fingerprint). There was no error.

(e) The defendant claims that counsel failed to present evidence that three other persons could have killed the victim, and that he failed to cross-examine them on other matters. The first witness, James L. Morgan, is a former boy friend of the victim. The victim had obtained a protective order against him more than one year before her death, based on an allegation that he had threatened to kill her. A friend of the victim told police that the victim had received three telephone calls from someone named "Jim" three days before she was killed. She implied that the victim was only slightly annoyed by these calls. There is no suggestion that the caller had threatened the victim, and it is not known if the calls were made by Morgan. It should be noted that Morgan had an alibi.

The evidence on which the defendant bases his claim is hearsay, which is generally inadmissible unless it falls within an exception to the hearsay rule. See *Commonwealth* v. *Keizer*, 377 Mass. 264, 269 (1979). "We have suggested that hearsay may be admitted, in the judge's discretion, to show that a third party might have committed the crime for which the defendant is being tried provided the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other '*substantial connecting links*' to the crime" (emphasis added). *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000), citing *Commonwealth* v. *Rosa*, 422 Mass. 18, 23 (1996) (hearsay inadmissible to show that third party may have committed crime unless certain criteria are met). The defendant has produced no other evidence substantially linking Morgan to the killing. Therefore, the hearsay evidence about a one year old threat would not have been admissible, and the defendant would not have been entitled to pursue this theory at trial. The defendant identifies no other exception to the hearsay rule that would support the admission of this evidence.

The second person who the defendant argues could have killed the victim was her then current boy friend, John Madden, with whom the victim is claimed to have said she had a "shaky" relationship. As with the hearsay evidence concerning Morgan, because there was no other evidence substantially linking Madden to the victim's death, the hearsay evidence about a shaky relationship between them would not have been admissible and the defendant would not have been entitled to pursue a theory that Madden had committed the murder.

The defendant also contends that counsel was ineffective for failing to cross-examine Madden about what he had described to police as his "open" relationship with the victim. The defendant suggests that this "open" relationship would have supported his claim that he and the victim had an intimate relationship. The defendant has misconstrued Madden's meaning about their "open" relationship. By "open," Madden meant that he and the victim kept no secrets, that is, that the victim "would have told him about any other boyfriends." Madden told police that to his knowledge she was not seeing anyone. The line of questioning the defendant proposes likely would have undermined a defense of consensual sexual intercourse. Avoiding this risky subject was not manifestly unreasonable. See *Commonwealth* v. *Britto*, 433 Mass. 596, 605 (2001).

Finally, the defendant faults counsel for failing to point the finger at the defendant's aunt, Jewel Whatley, for the death of the victim. He cites evidence of frequent arguments between the victim and Whatley or members of the victim's family to support his theory. One such argument with a family member allegedly involved a knife. The evidence on which the defendant relies is hearsay, and because he produced no other evidence substantially to link Whatley to the victim's death, the evidence is inadmissible and he would not have been entitled to pursue this theory. *Commonwealth* v. *O'Brien, supra.*

In addition, it was not manifestly unreasonable for counsel to refrain from cross-examining Whatley about her own past problems with the victim. Notwithstanding any differences they may have had over the years, Whatley and the victim were close friends. The judge, who had the opportunity to assess Whatley's credibility, described her as a "confused but appeal-

ing trial witness," adding that "it would have been foolish for defense counsel to suggest that [she] stabbed [the victim] to death and burned her apartment." He noted that Whatley and the victim had spent a happy evening together at the wedding reception, and that the jurors viewed them together in a videotape of the reception.

The judge succinctly described the challenges for the defense as "the fresh sperm DNA evidence and his bragging about burning, smoking and putting holes in a woman who had disrespected him. Neither of these items could be charged against James L. Morgan, John Madden or Jewel Whatley." The only person substantially connected to the victim's death was the defendant, and counsel would not have been permitted to present a third-party culprit defense based solely on inadmissible hearsay. It was not manifestly unreasonable of counsel to refrain from doing that which he was not entitled to do.

(f) The defendant asserts that counsel was ineffective for failing to impeach Alan Paine and other witnesses who testified about his admissions with favorable proof that conclusively established that they were falsely implicating him. The only specific "favorable proof" he identifies involves the day in March, 1996, when Paine testified that the defendant told him he "expected to be arrested for murder" and that the police were "trying to set [him] up like O.J. Simpson." The defendant contends that he furnished counsel with employment records indicating that he was at work at the time and date that this statement was allegedly made. However, as the judge noted, the point defendant raises had minimal potential value and high potential risk of harm. There were four other witnesses who testified about incriminating statements the defendant made, and this statement he made to Paine was one of the least damaging. Moreover, if counsel had offered the evidence in question to support a claim that he could not have met with Paine on that particular day, it could have opened the door to questions about the defendant's involvement with guns that he allegedly delivered to Paine and which resulted in firearms charges being filed against both Paine and the defendant, a matter that had been excluded as a result of counsel's efforts. Counsel instead trod carefully around the date in March, 1996, and nothing was

said about the guns. Counsel aggressively cross-examined Paine about the grant of immunity under which he testified. He also aggressively challenged the credibility of the other witnesses who testified about the defendant's admissions, and he elicited testimony from some that the defendant had been intoxicated at the time he made the statements. He also argued the points carefully in his closing. The judge concluded that counsel "made a sensible tactical choice" to avoid any challenge to the date in March, 1996, and instead concentrate on safer and more productive areas for impeachment. We conclude that counsel's decision was not manifestly unreasonable.

(g) The defendant argues that counsel failed to move for a mistrial when the Commonwealth failed to call a witness, Beverly Wilson, who the prosecutor stated in his opening would testify that the defendant told her that he was in Florida, where the conversation took place, because the police were looking for him for a murder. The prosecutor also mentioned in his opening that Wilson asked the defendant if he committed the murder and the defendant indicated that he did not. The prosecutor expected to call Wilson to testify, and he had a good faith basis to believe that she would testify as he anticipated in his opening statement, as the statements he attributed to her are consistent with statements attributed to her in an affidavit attached to an application for a search warrant that was issued in the underlying investigation. See *Commonwealth* v. *Fazio*, 375 Mass. 451, 454-455, 456 (1978).

The judge noted that the reference did not cause any material prejudice in view of the admission the defendant made to other witnesses, and because he instructed the jury that statements of counsel are not evidence and that their verdict must rest solely on the evidence. Moreover, trial counsel argued the Commonwealth's failure to call Wilson to the defendant's advantage, implying a gap in the Commonwealth's proof. The defendant has failed to show that the prosecutor never intended to call Wilson or that trial counsel should have been aware of that secret intent. Trial counsel had no reason to seek a mistrial, and it is unlikely that one would have been granted.

(h) There is no merit to the claim that counsel was ineffective for failing to move for a bill of particulars to ferret out that the

Commonwealth was proceeding under a theory of felony-murder in the first degree based on aggravated rape. Counsel anticipated precisely this theory and countered it, successfully, with testimony that the defendant and the victim had consensual sexual intercourse. The defendant was not convicted of felony-murder based on aggravated rape. See note 2, *supra*. Nothing more could have been accomplished by a bill of particulars.

(i) Also unavailing is the claim that counsel should have objected to evidence of use of a "rape kit," where he claims there was absolutely no evidence of a rape. We need not revisit the evidence of rape, as the same has been discussed, *supra*.

(j) Counsel was not ineffective because he elected not to make an opening statement. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 390-391 (1992).

(k) Counsel was not ineffective for failing to request an instruction calling for juror unanimity as to the factors set out in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), pertaining to the elements of extreme atrocity or cruelty. No such instruction was required, as discussed, *supra*.

(l) The defendant claims that counsel was ineffective for failing to move to dismiss the murder indictment on the ground that evidence of his refusal to submit a DNA sample or fingerprints was improperly presented to the grand jury. See *Commonwealth* v. *Hinckley*, 422 Mass. 261 (1996). Where such evidence is presented to the grand jury, as distinguished from trial, the question is whether the evidence impaired the integrity of the grand jury proceedings. See *Commonwealth* v. *O'Dell*, 392 Mass. 445 (1984). The evidence in this case involved a minor and an isolated instance where, in response to a grand juror's question whether the defendant declined to give up his clothing voluntarily for DNA testing, the State police witness answered, "Yes." When another grand juror later asked how they obtained the evidence, including the defendant's palm print if he did not offer them voluntarily, the assistant district attorney presenting the case directed the witness not to answer. The defendant had given his palm print voluntarily, and the prosecutor's effort to prevent harm thus may have caused some. However, any harm that was caused did not likely impair the integrity of the proceedings. First, there is no indication that

what occurred was intended unfairly to obtain an indictment, that is, that the witness or the prosecutor acted in bad faith. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986). Second, the incident did not likely influence the grand jury's decision to indict. See *Commonwealth* v. *Kelcourse*, 404 Mass. 466, 468 (1989). There was ample and far more significant evidence on which the grand jury likely based their decision to indict. Because a motion to dismiss probably would not have been successful, counsel was not ineffective for failing to move for dismissal.

(m) We have considered other points raised by the defendant in his claim of ineffective assistance of counsel and conclude that they have no merit.

8. *Request for posttrial discovery and evidentiary hearing.* The judge properly denied the defendant's request for posttrial discovery because he failed to establish a prima facie case for relief. See *Commonwealth* v. *Tague*, 434 Mass. 510, 519 (2001), cert. denied, 534 U.S. 1146 (2002). An evidentiary hearing was not required on the motion for a new trial because the defendant did not raise a substantial issue in his motion.

9. *G. L. c. 278, § 33E, review.* We have reviewed the entire case, including the record, the transcripts, and the briefs, and we conclude that there is no reason to reduce the murder conviction or to order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*