## Commonwealth vs. Ronjon Cameron.

No. 05-P-59.

Berkshire. April 9, 2007. - August 17, 2007.

Present: Berry, Green, & Graham, JJ.

*Rape-Shield Statute. Evidence,* Consciousness of guilt. *Practice, Criminal,* New trial, Assistance of counsel.

At the trial of an indictment charging rape, there was no error in the judge's refusal to permit the defense counsel to cross-examine the victim in front of the jury regarding specific instances of her recent sexual conduct, where counsel apparently made no attempt to pursue the questioning, as permitted by the judge, during voir dire of the victim. [746-747]

A trial judge did not err in denying a criminal defendant's pretrial motion to preclude evidence of his prolonged absence from the Commonwealth and in instructing the jury on consciousness of guilt. [747]

A Superior Court judge did not err in denying a criminal defendant's motion for a new trial on the basis of newly discovered evidence, where the evidence contained in the supporting affidavits simply was not credible. [747-749]

A criminal defendant failed to establish that his counsel had provided ineffective assistance at trial by his failure to cross-examine a Commonwealth expert or to claim unfair surprise when the Commonwealth introduced an amended report that differed from evidence provided to counsel earlier, where the amendment was never shown to be relevant to the issue of the defendant's guilt and reflected a change in nomenclature with no substantive implications. [749-750]

INDICTMENTS found and returned in the Superior Court Department on October 29, 1999.

The cases were tried before *Thomas J. Curley, Jr.,* J., and a motion for new trial, filed on May 5, 2005, was considered by *John A. Agostini,* J.

*Kenneth I. Seiger* for the defendant.

*Karen L. Carlo,* Assistant District Attorney, for the Commonwealth.

GRAHAM, J. The defendant was convicted by a Superior Court

jury of two counts of rape. G. L. c. 265, § 22(*b*). On appeal from those convictions and the order denying his motion for a new trial, the defendant contends that his trial counsel was ineffective, and that the trial judge improperly barred him from cross-examining the victim regarding specific instances of her recent sexual conduct and improperly admitted evidence of his absence from the Commonwealth as consciousness of guilt. In addition, he argues that newly discovered evidence casts real doubt on his convictions. We affirm.

*The evidence at trial.* We set out the basic facts that could have been found by the jury, reserving some details for discussion in our consideration of the defendant's several claims. In September of 1999, the victim and her boyfriend, Robert Lanphear, lived in separate apartments in the same building in Pittsfield. Lanphear was forced to vacate his apartment to begin serving a jail sentence, and the victim agreed to keep an eye on his apartment and check it from time to time.

On September 13, 1999, the victim, who is deaf, went to Lanphear's apartment to retrieve the key, which had reportedly been left on a hook in the kitchen by Lanphear's sister. When the victim arrived at the apartment, the door was open. She entered the apartment and saw the defendant. The victim expected the defendant to be there since he had agreed to take possession of the apartment in Lanphear's absence. She had met the defendant earlier, in August of 1999, but had no relationship with him other than exchanging greetings in passing. The victim asked the defendant where the key was and the defendant appeared to understand what she was referring to. The victim smelled alcohol on the defendant's breath. When she did not get a response from the defendant, the victim went into the kitchen to retrieve the key but was unable to locate it.

The victim asked the defendant several times where the key was, and the defendant became angry and replied, "I don't know where the key is." Upset with the defendant's answer, the victim told the defendant, "Fine, I'm going to tell [Lanphear] what's happening here." She then left the apartment, but returned immediately after recalling that Lanphear had asked her to pick up photographs of his children that were in the apartment and bring them to him at the prison.

As the victim retrieved the photographs, the defendant grabbed her from behind, threw her to the floor, and then dragged her to a large La-Z-Boy chair. There, he pushed her head to the chair, pulled down her pants, and forced his penis into her vagina, and then into her rectum. The assault lasted approximately two to five minutes.

After the defendant left the apartment, the victim put on her clothes and returned to her apartment. Although the victim's roommate was present in the apartment, the victim did not tell her that she had been sexually assaulted, nor did she report the rape to the police. Two days later, the victim told her roommate about the incident and then, accompanied by her roommate, went to the Pittsfield police station and reported the rape to Detective Thomas Bowler.[1] Bowler began his investigation of the incident that day. As part of the investigation, Bowler collected clothing, including the underpants worn by the victim on the date of the assault. The victim reported that the underpants had been washed one week earlier and had been worn twice — on the day of the assault and two or three days prior to the assault. She further reported that the underpants had not been washed after September 13, 1999, the date of the incident.

Bowler also took pictures of bruises on the victim's back and rug burns on her knees and suggested that she see a doctor. The victim agreed to be seen by a doctor, but waited until September 20, 1999, a full week after the assault, before seeing Dr. Mark Liponis, an emergency room physician at the Berkshire Medical Center. She informed Dr. Liponis that she had been thrown to the floor and dragged across the carpeted floor of her boyfriend's apartment and then raped vaginally and anally. She complained of both vaginal and rectal pain, and complained of a small rug burn on her left leg.

Dr. Liponis described in his notes a six-centimeter scratch on the victim's left leg and small bruises on her left shin. He also noted there were "no external signs of trauma," but opined that unless the assault was extremely traumatic it was unlikely for there to be trauma one week after the incident. The rape kit and

[1]Although the victim reported the rape on September 15, 1999, the official report of the incident was taken on September 17, 1999, after Detective Bowler was able to secure the services of a sign language interpreter.

the clothing collected from the victim were sent to the Mas-
sachusetts State crime laboratory where a chemist assigned to
the case detected seminal residue on the crotch of the underwear.
This evidence was sent for deoxyribonucleic acid (DNA) testing
to a private laboratory. The test results from the victim's
underwear indicated the presence of DNA from at least two
males. A primary sample excluded the defendant as the donor
of the sample. A secondary sample neither included nor excluded
the defendant as the donor.

The defendant, meanwhile, had been arrested by the police
on September 15, 1999. He was released on bail on April 7,
2000, on condition that he report to probation weekly and keep
probation notified of his address. However, on April 24, 2000,
the defendant violated his conditions of release. According to
the defendant, he went first to a shelter in Connecticut, then to
a psychiatric facility in Minnesota, and in November, 2000, to
Key West, Florida, where he visited each winter. It was in Key
West that the defendant was arrested in November of 2001
pursuant to an outstanding warrant. On November 9, 2001, he
was returned to the Commonwealth's custody.

*Rape-shield statute.* The defendant contends that the trial
judge erred in denying his written motion to permit inquiry of
the victim regarding her "prior sexual acts." At the hearing on
his motion, the defendant argued that evidence that another
person might have been the source of the secondary semen
sample bore on the victim's motive to fabricate the charges.
The following colloquy transpired:

> TRIAL COUNSEL: "There may be a motive on her part to
> fabricate a charge against [the defendant]."
>
> THE COURT: "What would that be? I don't understand."
>
> TRIAL COUNSEL: "Well, Judge, I don't know. It's — it is
> probably anything related to human nature but it could
> very well be that she was embarrassed, maybe word would
> have gotten back to her boyfriend in jail that she had some
> form of sexual relations with someone else and maybe, in
> a way, to cover this up.
>
> "I'm saying maybe because I don't really know but I

would suggest to you that there may be a motive to fabricate and this may very well be relevant to explore and to determine whether that exists.

"...

"Well, Judge, as best as I can at this point, without knowing exactly what certain witnesses are going to testify to, let's just say and let's just assume that her boyfriend is in jail, he's been in jail for a month, and let's just assume she did have sex with somebody, not [the defendant] but with somebody else, and in an effort to hide that, in an effort to prevent her boyfriend from being upset at her, she comes up with this story that it was [the defendant] and, you know, the rest follows after that.

"That's why — that's — that is the point that I'm trying to get here. I don't know if the evidence will evolve that way but that is — that is a feeling that I have, an assumption that I'm making with respect to how the events develop in this case."

At the conclusion of the colloquy, the trial judge ruled that since evidence would be forthcoming that seminal fluid from someone other than the defendant was present in the victim's underwear, the defendant had the evidence needed to make his argument. He ruled, "So I don't think any further proceedings are required right now." However, the trial judge left the door open, adding, "I'll think about it a little bit more. Maybe, [defense counsel], you can persuade me otherwise, but right now the motion to inquire of [victim's] prior sexual acts is denied."

During the defendant's cross-examination of the victim, the trial judge held a voir dire to allow defense counsel to further inquire about the rug burns the victim claimed to have received from her encounter with the defendant. Defense counsel asked the victim whether sexual activity prior to the date of the alleged incident could have accounted for the rug burns. The victim answered, "No." Defense counsel then asked the trial judge if he could make further inquiry of the victim, stating, "I guess I need to know whether I can go further with this in

terms of my inquiry or if your ruling regarding my motion on this topic would probably preclude that." The trial judge replied, "If you want to ask a question, you can, and I'll hear from [the prosecutor] if he wishes to object to it." Defense counsel, however, repeated his earlier question regarding the rug burns, and then ended his voir dire examination of the victim. The trial judge did not permit defense counsel to ask the same question in front of the jury.

The rape-shield statute, G. L. c. 233, § 21B, reads in pertinent part:

> "Evidence of specific instances of a victim's sexual conduct in such an investigation or proceeding shall not be admissible except evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however, that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof. If, after said hearing, the court finds that the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim, the evidence shall be admitted; otherwise not."

The statute is not intended to create an absolute bar to the admission of sexual history evidence in all cases. *Commonwealth* v. *Pearce*, 43 Mass. App. Ct. 78, 86 (1997), *S.C.*, 427 Mass. 642 (1998). Rather, "[r]ape-shield statutes are 'aimed at eliminating a common defense strategy of trying the complaining witness rather than the defendant. The result of this strategy was harassment and further humiliation of the victim as well as discouraging victims of rape from reporting the crimes to law enforcement authorities.' " *Commonwealth* v. *Fitzgerald*, 412 Mass. 516, 523 (1992), quoting from *Commonwealth* v. *Joyce*, 382 Mass. 222, 228 (1981). See *Commonwealth* v. *Chretien*, 383 Mass. 123, 138 (1981).

Evidence of the victim's sexual conduct with the defendant, and of recent conduct "alleged to be the cause of any physical feature, characteristic, or condition of the victim," may be admissible. G. L. c. 233, § 21B. Such evidence is admissible

only "after an in camera hearing on a written motion for admission of [said evidence] and an offer of proof." *Ibid.* The judge then determines whether "the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim." *Ibid.* "This determination is within the sound discretion of the judge." *Commonwealth* v. *Pearce*, 427 Mass. 642, 648 (1998).

Here, the defendant filed a written motion in limine seeking permission to ask the victim about her "prior sexual acts." At a lobby conference the trial judge denied the motion, but informed counsel that he would reconsider his ruling. Indeed, the trial judge, sua sponte, allowed the defendant to address the issue again during the voir dire conducted during the defendant's cross-examination of the victim. However, the defendant apparently made no attempt to pursue the questioning. Cf. *Commonwealth* v. *Chretien*, *supra* (defendant not entitled to cross-examine victim on recent sexual conduct where he failed to elicit evidence at voir dire to support defense theory); *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 12 (1980). There was no error in the trial judge's refusal to permit the defendant to question the victim "as to prior sexual acts."

*Consciousness of guilt.* The defendant argues that the trial judge committed error in denying his pretrial motion to preclude evidence of his absence from the Commonwealth from April, 2000, to November, 2001, and in instructing the jury on consciousness of guilt, because there was no evidence presented at trial that he knew of his trial date. However, as evidence of prolonged or distant travel from the Commonwealth is admissible to show flight, see *Commonwealth* v. *Otsuki*, 411 Mass. 218, 237 (1991), and "[f]light is perhaps the classic evidence of consciousness of guilt," *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990), we find no error in the trial judge's ruling that the evidence was admissible and that it was for the jury to determine whether the defendant's actions in leaving and staying away from the Commonwealth were motivated by a consciousness of guilt. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 735 (1990).

*Newly-discovered evidence.* The defendant also contends that his motion for new trial should have been allowed because

newly-discovered witnesses provided material, credible evidence that cast strong doubt on the victim's testimony. The evidence was presented in the affidavits of two witnesses, Kim Marie Grievson and Melba McKim, whom the defendant says were unknown to him until approximately two years after he was convicted of the crimes. Grievson stated in her affidavit that the victim admitted that she lied when she accused the defendant of rape. McKim stated in her affidavit that she drove the victim to Lanphear's apartment on the date of the incident, that she was with the victim after the victim visited Lanphear's apartment, and that the victim did not appear to be upset or disturbed. Both affiants claimed that the victim was predisposed to lying.

The well-established principles governing a motion for a new trial based on newly discovered evidence are set forth in *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986):

> "A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction. . . . The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. . . . Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial. . . . The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury's deliberations."

Passing on the question whether the evidence was newly discovered, we address the motion judge's finding that the new evidence contained in the affidavits simply was not credible. Grievson, in her affidavit, claimed that the victim said that she had sex with the defendant and that the sex was consensual. This statement, as the motion judge found, was inconsistent with the defendant's trial testimony that he did not engage in any sexual activity with the victim. In addition, the motion judge found that Grievson's affidavit was inconsistent with her prior statement to the police.

With respect to McKim's affidavit, the motion judge found

that her statements were at odds with the victim's statements with regard to the time and place of the rape. The motion judge concluded that McKim's affidavit "sheds little additional light on the events central to this case," and that her affidavit was "neither helpful nor credible." We see no error in the motion judge's denial of the defendant's motion for new trial since the motion judge could properly determine that the new evidence failed to cast doubt on the convictions.

*Ineffective assistance of trial counsel.* In accusing his trial counsel of ineffectiveness, the defendant points to his failure to cross-examine the Commonwealth's DNA expert or to claim unfair surprise when, at trial, the Commonwealth introduced a DNA report that differed from the report provided to defense counsel earlier. In that earlier report, the allele located at a specific spot for both the underwear sample and the defendant's blood sample was designated as "10." One week before the report was entered as evidence, the laboratory that conducted the DNA testing amended the DNA report. The amended report, which was provided to the defendant prior to trial, changed the designation of that allele from "10" to "13." According to the amended report, the change "reflect[ed] ISFG nomenclature recommendations."[2]

The long-established standard of review applicable to the claim of ineffective assistance of counsel is set out in *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). To prove this claim the defendant must establish (1) that there was a serious incompetency of trial counsel ("behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer"), and (2) that this incompetency "likely deprived the defendant of an otherwise available, substantial ground of defen[s]e." *Ibid.* See *Commonwealth* v. *White*, 409 Mass. 266, 272-273 (1991), quoting from *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978) (review of "tactical or strategic decisions" should be conducted in deferential manner "to avoid characterizing as unreasonable a defense that was merely unsuccessful"; "challenged tactical judgments must be [shown to be] manifestly unreasonable").

---

[2]According to the Commonwealth's brief, ISFG stands for International Society for Forensic Genetics.

"The defendant's trial counsel was under a duty imposed by both State, see *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), and Federal, see *Strickland* v. *Washington*, 466 U.S. 668, 690 (1984), constitutional law to conduct an independent investigation of the facts, including an investigation of the forensic, medical, or scientific evidence on which the Commonwealth intended to rely to prove the defendant's guilt." *Commonwealth* v. *Baker*, 440 Mass. 519, 529 (2003). However, whether the allele in question should be designated as "10" or "13" was never shown to be relevant to the issue of the defendant's guilt.

Moreover, in concluding that trial counsel was not ineffective by reason of his failure to cross-examine the Commonwealth's DNA expert about the amended DNA report, the motion judge found that the amended DNA report reflected a "change in nomenclature . . . and had no substantive implications." The motion judge's conclusion is supported by the record.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*